OPINION OF THE COURT
Fuchsberg, J.
The essential issue on this appeal is whether, in the context of a prosecution which relied on both direct and circumstantial evidence, the People presented sufficient proof to support a jury verdict declaring defendant Dr. Mark J. Gerard, a veterinarian specializing in the care of racehorses, guilty of two counts of "fraudulent entries and practices in contests of speed” arising out of a celebrated incident of "horse-switching” at Belmont Park Racetrack in 1977.[1] The statute under which he was indicted and convicted is subdivision 1 of section 12-a of chapter 440 of the Laws of 1926 (as amd by L 1965, ch 1031, § 194).[2]
The record reveals a factual scenario that might have been authored jointly by an Alfred Hitchcock and a Damon Runyon. The alleged intrigue may be said to have hit the light of day after September 23, 1977, when a recently imported Uruguayan four-year-old bay thoroughbred entered in the ninth race at Belmont Park under the name Lebon won handily, finishing four lengths ahead of the pack. Having ended up as a miserable "also-ran” in its only previous North American outing, the horse in its second entry went to the post at pari-mutuel odds of 57 to 1. As one of the lucky bettors, defendant’s share of the winner’s pool was approximately $77,000.
*396 These seemingly coincidental events soon were revealed to be anything but happenstance. Suspicions voiced by several Uruguayan racing fans led to the discovery that the winning horse in fact was not the "longshot” Lebon, a South American five year old that had not won a race since its legs began to fail, but a virtual look-alike, Cinzano, a highly touted prizewinner also brought in from Uruguay at the same time. As it turned out, Gerard had arranged for the purchase of both horses from their South American owners several months earlier, the $450 Lebon ostensibly for Jack Morgan, defendant’s former trainer, and the $150,000 Cinzano for Joseph Taub, a client and investor in sports enterprises.
Shortly after the. animals had arrived at John F. Kennedy International Airport in New York City, and immediately following their release from quarantine, they were stabled at Gerard’s Muttontown, Long Island, horse farm, where, within no more than a day after their arrival, an unfortunate incident purportedly befell Cinzano. As it was being returned to its stall after exercise, it allegedly reared up, struck its head on a ceiling beam and fell, fracturing its skull and breaking a leg in the process. The report the defendant soon thereafter was to file with Taub’s insurance company (which was to indemnify the owner for the loss in full)[3] claimed that the severity of the injuries necessitated the prompt destruction of the horse, which Gerard personally effected that very day.
According to the available proof, only Gerard and his estranged wife were eyewitnesses to the euthanasia. Thus, since the animal’s carcass was disposed of without any loss of time, the couple appears to have beén the only ones in a position to make a positive identification of the horse that was despatched. But Gerard never took the stand, and his wife was not called during the People’s case. However, the defense did stipulate that of the two horses, the survivor, who remained in Gerard’s care and control, was Cinzano.
Additional data of significance were proffered by the People in the form of testimony by Jack Morgan. Defendant’s former trainer related that Lebon had been shipped in from South America in his name because State Racing and Wagering Board rules prohibited veterinarians from owning horses licensed to race in New York (see 9 NYCRR 4002.14). Actually, *397 he told the jury, he was only the "paper owner”, Gerard having paid the purchase price of the horse and the expenses of its care, completed its registration forms and participated in deciding when and where it was to race. Morgan further denied that he had any inkling that "Lebon” was Cinzano.
This as background, the defense theory, bearing in mind that knowledge was an essential element of the crime charged, was that Gerard himself was unaware of the imposture. To support this contention, it relied almost entirely on Mrs. Gerard, who was a horse fancier in her own right. Having been granted immunity by the Grand Jury, she maintained that it was she who, on her own initiative, had arranged the purchase of the two animals, had exchanged their identifying halters and, as the only eyewitness to the accident, had misled the defendant, whom she thought incapable of distinguishing Lebon from Cinzano, into believing that it was the latter that had been injured. Mrs. Gerard, who had a history of emotional disorders and was under a psychiatrist’s care at the time of trial, explained further that she had devised the scheme because she had long been incensed over what she perceived to be the racing industry’s indifference to the welfare of the animals around which it was built. To hear her tell it, her plan was to alleviate this condition by establishing a humane society for thoroughbreds. The money she hoped to win with a "ringer” was to provide her with the wherewithal to finance reforms.
Insisting that this testimony "accounts for all the facts proven” and is therefore "consistent with either the hypothesis of innocence or the hypothesis of guilt”, defendant argues that the prosecution failed to prove its case beyond a reasonable doubt (see People v Montanez, 41 NY2d 53, 57). But that evidence leaves a jury with a choice between competing facts and inferences does not mean that a prima facie case has not been established. Characteristic of the existence of a question of fact is that there be at least two sides. The essential thing is that, after a trier of facts weighs the choices qualitatively and quantitatively, the selection it makes be one arrived at beyond a reasonable doubt (People v Castillo, 47 NY2d 270, 277).
Nor in this case need we be concerned with the so-called "moral certainty” standard utilized to draw a jury’s attention additionally to the "complex analytical function” it may have to perform in cases that depend entirely on circumstantial *398 evidence (see People v Barnes, 50 NY2d 375). For, since the stipulation as to the identity of the surviving horse as well as the testimony of Jack Morgan were in the nature of direct evidence, it cannot be said that the prosecution’s case rested on circumstantial evidence alone.
These principles in mind, we observe that defendant at this stage continues to focus, as he did at trial, on the issue of scienter, emphasizing that the proof of that element was insufficient to support a finding of its existence beyond a reasonable doubt. We note, however, that there was a barrage of circumstances developed by the People on this matter.
These include such things as Gerard’s admission to the State Racing and Wagering Board that he could tell the two horses apart when they were brought into the country; the fact that Lebon was seen wearing a halter with the name Cinzano on it at the Gerard farm the day it became a casualty; defendant’s solicitation of a fellow veterinarian to state falsely on the insurance report that the latter had examined "Cinzano” the night it was destroyed; his disposal of Lebon’s remains so that its distinguishing markings would no longer be available for comparison with those of the true Cinzano; his use of yet another pseudonym to identify the horse when it was quartered at Saratoga the month before the race; his advice to track personnel that "Lebon” was four years old when, as he had to have been aware from the documents he had processed, the true Lebon would have been five; and his placement of $3,100 in bets on a horse which he supposedly believed was a "has-been” sold for a nominal $450.
Moreover, the record also highlights evidence that, once news of the switch broke, defendant engaged in conduct that can fairly be interpreted as an attempt to cover up his wrongdoing: He told the manager of the stables at Saratoga to deny that he had ever paid for "Lebon’s” care there. He tried to induce Morgan to assert ownership of "Lebon” at a racing board hearing and offered him counsel of his choice at no cost. He tried to badger the veterinarian who signed the insurance form to adhere to his misrepresentation that he was present at the Gerard farm the night of "Cinzano’s” destruction. And he even assisted in the falsification of the doctor’s diary entries on the events of that evening.
As a counterpoise illustrating how open and aboveboard his comportment was, defendant relies in particular on such *399 things as the fact that, in completing customs forms when the horses arrived in the United States, he was reasonably accurate in noting the small differences in their markings; that the two Belmont races in which "Lebon” was entered were low stakes claiming races, a course of conduct that would have been irrational, it is asserted, if he knew the colt was worth $150,000 because claiming race rules permit anyone who bids the stipulated amount ($10,000 or $16,000 here) to claim the mount for that price at the finish; that he personally placed his bets on these races at Belmont rather than at a remote betting facility; that the amount he wagered was no more than his "usual bet”; and that he cashed his winning tickets on the day of the race and openly discussed them with the track’s wagering personnel.
But, almost needless to say, the jury did not have to draw the inferences defendant suggests. For one thing, reliance on the testimony of Mrs. Gerard is not, of course, necessarily availing since the jury could and apparently. did pass adversely on her credibility when it voted to convict. So too, for example, that Gerard accurately drew the distinguishable identifying marks of Lebon and Cinzano on the customs forms may be seen not so much as the lack of a plan to deceive as an indication of his ability to tell them apart. And, considering Lebon’s anonymity in this country, resort to claiming races could reasonably be viewed as a minimal risk.
In sum, from the pattern of facts and deceptions as a whole emerges a solid basis for inferring that Gerard knew "Lebon” was Cinzano and, in consequence, that he masterminded the plan to race the "ringer”. That this plot was not flawlessly conceived and executed does not prevent the jury from finding beyond a reasonable doubt that that inference was justified.
We therefore conclude that the conviction was premised on legally sufficient evidence.[4] Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Meyer concur.
Order affirmed.

. Defendant was sentenced to a $1,000 fine on the first count and a one-year period of imprisonment on the second. This appeal is from an order of the Appellate Division, Second Department, which affirmed the judgment of conviction.

. Section 12-a reads, in relevant part: "Fraudulent entries and practices in contests of speed. Any person who: 1. Knowingly enters for competition, or furnishes to another person for entry or competition, or brings into this state for entry or competition for any purse, prize, premium, stake or sweepstakes offered or established by any person, association or corporation, any running, trotting or pacing horse, mare, gelding, colt or filly under an assumed name, or out of its proper class, or that has been painted or disguised or represented to be any other or different horse, mare, gelding, colt or filly from the one which is purported to be entered where such prize, purse, premium, stake or sweepstakes is to be decided by a contest of speed * * * Shall be guilty of a misdemeanor, punishable by a fine of not less than five hundred nor more than fifteen hundred dollars, or by imprisonment for not more than one year, or both.”

. We are advised by counsel on this appeal that, at the time of trial, the insurer was seeking to recover this amount from Taub.

. As to other points raised by the defendant, suffice it to note that we find them to be without merit.